May it please the Court, my name is Alvin Schroeder, and I represent the Plaintiffs and Appellants in this case that are Jesse and Pam White and Eason Land Co. They have appealed the Magistrate's report and the District Court's affirmation of that report. Both these decisions stand on its head. The Supreme Court's decision in 2004 of Norton v. Southern Utah Wilderness Alliance. To give some perspective of this case, it's important to note that this arises in a rugged southeastern area of Malheur County. To give some perspective relative to where we stand here today, Google reports that the Portland area is inclusive of perhaps 100,000 acres or 145 square miles. The area in question that we're talking about here, where my clients, the Whites, have water rights that arose from and were acquired between 1914 and 1966, are in an area that is inclusive of about 360,000 acres or about three times the area of this Portland area. A very vast area. After the clients, Eason's Whites, acquired these water rights, what occurred in a period of time between about 1960 and 1976 is that the Bureau of Land Management, or BLM, constructed various reservoirs on the drainages associated with these water rights. These reservoirs were inclusive of 20 reservoirs, and these violated impaired trespass upon the water rights of the Whites. So what happened is that the BLM and the Whites got a deal. They made a deal in 1973 in which the deal was rather simple. They were trading water for grass. And so as a product of that, the BLM and the Whites, although there was some tension over the 35 years that the 1973 agreement was in place, it worked fine. BLM trespassed and otherwise used the water associated with the 20 offending reservoirs, and the Easons received benefit of the 14 animal unit months, or AUMs, of grass associated with that. Then, when you fast forward, what happened in about 2007 was there got to be a point of tension which was irreconcilable. That irreconcilability occurred as a product of the fact that the Whites made a call for water, and BLM looked upon that call for water as a breach of the 1973 agreement. And so as a product of that, the BLM started an unfolding of the 1973 agreement in which they were going to assess through an environmental assessment document or a NEPA document of a variety of alternatives. But the key and the key foundation for all that is BLM's position. That BLM had no discretion to comply with state water laws, meaning that they had to and must conform to when they were in trespass relative to these 20 offending reservoirs. And so therefore, they had to deal with it. And so what they decided to do is that in 2008, they issued a decision document. We're not talking about a lot of the cases in which the federal defendants have sided, and we have sided, and where the court has struggled with 7061 claims where there's programmatic discussions of land use plans. Here we're talking about an actual order in which the BLM decided to allocate AUMs for each reservoir. And so what we're really dealing with here is not independent, or I should say a lowly entire transaction here, but 20 separate events in which there's 20 separate reservoirs and 20 separate AUM allocations associated with that. And so what happened in the Norton case in the 2004 decision, Judge Scalia made very clear that there was really a two-part test to that. The first part, we contend, the whites contend, is a rather simple part in terms of the first problem, is there a discrete agency action? And what they looked to was 702 of the Administrative Procedure Act and Section 551.13 of the Administrative Procedure Act. Counsel? Yes. In this case, what is the discrete agency action that you are challenging? The discrete agency action is the decision itself in which, at excerpts of record 240 and 241, the Bureau of Land Management made the discretion so as to comply to state water law, they had to remove or retrofit these 20 reservoirs in lockstep with the AUMs in question. And so what brought us here before this court? On 240 and 241, was there a written document that you're relying upon as the discrete agency action, a statement by an authorized official on 240 and 241? What is that that you're actually pointing me to? That is the actual decision, the actual order as used under the APA of the Bureau of Land Management ended up being the final agency action that is before the court. But aren't you actually challenging the way in which they complied or did not comply with that commitment? Well, not really. That question is answered yes and no. I apologize for the statement in that. The yes part of it is the foundation of the decision under the APA is the BLM's final decision itself. But you don't disagree with that. You're client-centered into an agreement, and that's not challenged here. They're not saying the BLM was wrong to make this accommodation, and then in proportion to rescoring the authorized to grant us back, you're fine with that. So that can't be the action that's being challenged. Well, that's correct. But the action that's being challenged is the agency decision itself said that it would remove and retrofit these 20 reservoirs in lockstep with the AUFs. It's the noncompliance with that proposed finding which became the final order. You're really challenging that. You're saying they didn't do what they said they'd do. They didn't restore water in an amount that equaled the rest that they were recovering. Yes, and there's no dispute as to that. Certainly, in the federal defendant's brief, they make a point, and the Chad Declaration, which was the intrinsic evidence that was offered in the motion to dismiss process, looked and applied the fact that, you know, have we conformed to the decision? And their overriding theme was yes. But yet, if you look carefully at the Chad Declaration, the government concedes at least as to two of the 20 reservoirs as to the Aguran Reservoir in which there's 74 exchange-of-use AUFs attached. They have done nothing. But yet, they have canceled the 74 AUFs. As to the Coyote Holes Reservoir, similarly, the BLM recognizes that they have done, they have not conformed to what they said they were going to do, but they took the AUFs. Now, there's another six of the 20 reservoirs in which the BLM said that they conformed, but they conformed through the pumping of the reservoirs. But their own decision document says that they could not and would not come. And so, certainly, there is no dispute as to the 20 in which the BLM has taken the exchange-of-use AUFs associated with that and done nothing about two of the reservoirs. There's also no dispute as to another six of the 20. And they total 944 of the 1,400 AUFs in which BLM's claimed conformance with their own decision was that they could come. And clearly, their own decision said that they could not. And so, in terms of going back to the Norton case, in terms of the first prong, I don't think there's any question we've conformed to the first prong in that we have an actual order that's issued. The second prong is, is there action on the BLM, is there the action that's required to take? And here, we answer in the affirmative in that the BLM acknowledged the fact that they had no discretion associated with conforming to state water law. And so, based on that umbrella, then the BLM applies Section 4 of the Gator Grazing Act. They apply the mandates under the Federal Land Policy and Management Act, particularly relating to Section 1733G. Also, the underlying grazing regulations, 4130.6-1, dealing with the exchange of use regulations, and subpart 4120 of grazing rules, dealing with the modification range improvements. And so, what the BLM did in applying those, much like in the Siskiyou case, in which the Forest Service dealt with a mining issue of compliance, they put together their own agency decision in this case, applying these rules and saying, okay, our interpretation and application of these rules will be like I stated in excerpts of record 240 and 241, in which we brought these reservoirs here, and for each one, as we remove a retrofit, we'll cancel the AUMs, and we're here because they have canceled all the AUMs, but they have not conformed to all of the decision, and there's no dispute about that, at least as to do of the 20. And your position is that's recognizable under the APA, right? The implementation of the decision as opposed to the decision itself. Well, I don't see that there is a distinction to that. You issue a decision, and the BLM says, in this particular case, they're going to say X, and if you don't follow or conform to X, certainly under 1733G, that's an unlawful act on the part of the agency. The distinction is that your clients don't disagree with the decision at which issue. They were fine with that. Okay. Yes. Give us back our rights, and we'll give you back what you gave us initially in exchange for those. Your clients had no problem with that. That was a satisfactory resolution. Their problem is that the BLM didn't follow through in the way that the agreement provided. Well, not the agreement, the decision. Okay, the decision. Correct. And so one of the distractions that occurred, at least in the magistrate's report, dealt with the substantial compliance issue somehow, because the BLM did most of it, that this is okay. And even the federal defendants claimed that, and I said that at the outset, that the BLM carried out the work of retrofitting and abandoning the reservoirs, and they just make that gratuitous statement. But even as I mentioned, the magistrate noted, and that's at ER-22, that at least the St. Jehuguerin Reservoir, they have canceled the AUMs, but yet they have not done a thing on this. What's the discrepancy as of the present time in your view? From a minimum of about 150 AUMs up to about 1,100 of the 1,400 AUMs, because two of the reservoirs, the Erwin and Coyote holes, equate to about 150 of the 1,400 AUMs. The other six reservoirs is an additional 944 of the 1,400 AUMs, so we're looking at about 1,100, 1,200 of the 1,400 AUMs. The BLM is continuing to impair and take the water right, but yet our clients are not getting paid for the grass in which their own decision documents that they would do. Counselor, do you want to save some time for a bottle? Yes. Thank you. Thank you. May it please the Court, I am David Shultz. I'm representing the Department of Interior and Bureau of Land Management. With me at counsel table is Jeffrey Peter from the Solicitor's Office of the Department of Interior. The suit to compel action allegedly required by the 2008 decision was properly dismissed by the district court because the whites did not and cannot point to any clear nondiscretionary duty imposed by statutory regulation to take a particular discrete agency action. And those are the requirements you need under the Norton v. Sua case to have a case under Section 706.1. This case is all about the implementation of the 2008 decision, and this Court and the Supreme Court are clear that that doesn't support a 706.1 action when you're just complaining about particular implementation. The 2008 decision here, it's not a statute or a regulation. It doesn't command the agency to do a specific discrete action. It simply describes the plan of acts for the BLM, how the BLM will comply with Oregon water law. And that's the only applicable legal duty here is to comply with Oregon water law. The water master, once the 1973 agreement was breached, and the whites were no longer forbearing from enforcing their senior water rights, the water master came to BLM and said, look, you need to have a plan to timely release water so that you don't interfere with downstream water rights. And the BLM said, okay, we'll consider some options. We'll do an environmental assessment. They decided on this proposed decision on what they would do to comply with Oregon water law. But when they set out what they would do at the various reservoirs, they were not creating a separate legal duty with regard to each of these reservoirs. They were simply saying, this is how we're going to comply with Oregon water law. And if there's a problem with or compliance with Oregon water law, the water master will do something and say you've got to do something more. But so far, that hasn't happened. You make it sound, though, like the whites don't have any stake in this, and yet the proposed agreement recognized that they had a stake in it and set up a mechanism for them to receive back land only as the water was released. I mean, why would they put that in there if the whites didn't, if the BLM didn't recognize that the whites had a stake in this? So the 1,400 animal unit months of extra grace came from this 1973 agreement. When that agreement was breached, when the whites said we're now going to enforce our rights, BLM no longer had an obligation to provide them with the extra 1,400 animal unit months for free. It could have ended them right then. It said, well, to be fair, we'll gradually reduce those extra water rights as we retrofit or abandon the reservoirs. It decided to do so on a proportional basis, but that was all discretionary. I thought the thing about after 1973, in the brief, it says 2006. Council said 2007 was the time that that proposal was made by the BLM representative in response to the whites calling for more water. So it's in the 2008 decision of the field manager that here's what we're going to do. We're going to retrofit these reservoirs, and as we do them, we will gradually withdraw the animal unit months proportionally. So that's all in the 2008 decision. They're not challenging that 2008 decision. No challenging implementation. They're saying BLM didn't do what they promised to do. That's what their challenge is, but you cannot bring that claim under 706.1 because it's not a claim to compel a specific legally required action. BLM has no, there's no legal requirement that BLM not withdraw those 1,400 extra animal unit months immediately. BLM could have done that because they had breached the 1973 agreement, which was the only basis for those extra animal unit months. You can see that it looks like the 1973 agreement was supplanted to some extent by the 2008 decision. The amount withdrawn, according to that 2008 decision, would be a percentage equal to the percentage of the reservoirs' acre feet. The water right relative to the weights, the entire water rights would be 185.46, so this was the solution to the problem that was raised by the weights, calling for more water. We'll give you the water, but as we do so, we're proportionally going to take back reason from you, right? Well, it's not an agreement. It's not a contract like the 1973 agreement. It's simply a decision of how BLM will comply with Oregon law and do it in a way that's fair to the rancher. The record makes out that this went to the BLM official. Charles was making a decision on this, and this was the proposal that he came up with to accommodate the weights, and they said fine with it, and it became final because there was no objection. You seem to be getting it in a short script and saying, well, we didn't have to do that. The problem is that BLM did do that at some point. Now, there's no jurisdiction under this statute for Charles and the implementation of that agreement or non-implementation of it, but it just seems to me that BLM agreed with the weights. Here's the way we'll resolve it. If you want more water, that's fine, but we're taking back the grazing land that we gave you initially in exchange for water rights. But BLM didn't create any new legal obligations, and, in fact, BLM has gone ahead and done the work. There is a dispute over whether it's done everything it promised to do. What do I make of the final order when you say that they didn't create any new obligation? I mean, why call it a final order? Why go through the whole process? Why meet and confer with the weights to come up with an agreeable solution? Well, I mean, it's characterized as a decision, and the weights argue, well, that's an order under the APA definition of order, and that's true enough, but an order under the APA definition can be anything an agency does that's not a rule, right? And so it doesn't necessarily order the BLM to do something. It didn't impose a legal obligation on the BLM. The BLM's only legal obligation is to make sure it's in compliance with Oregon water law and that they get their water downstream in accordance with what the water master is requiring BLM to do. Do you concede that it didn't happen the way the decision indicated it was supposed to happen, that is, that as water rights were restored, we would take back proportionally raising land? Do you concede that that is the state of affairs? The decision did not say that we absolutely have to provide this amount of additional grazing with each one. It was simply a proposed way to proportionally decrease these additional grazing rights, and with regard, for instance, to the Igeran Reservoir that's come up, what you see in the decision is it says, well, the water master has said that additional work might be required at the Igeran, so we will include this in the decision, and if the water master requires us to do things there, we'll do it. But it is not the sort of order which says, you know, a BLM must legally do this or else they're out of compliance, simply a plan of action, and that sort of plan of action cannot be enforced in a suit under 706 Subsection 1. I mean, they could have challenged the 2008 decision under 706-2 as arbitrary and capricious if they disagreed that the 73 agreement had been breached, and they no longer had any right to the additional 1,400 million months, but that's not what they've chosen to do. Well, they wouldn't have, because counsel concedes that the rights agreed with that as a resolution. He thought that the government was going to do what it said it was going to do, which is if all the rights are restored, they'll take back the land proportionally. They had no disagreement with that. The disagreement is they didn't, the government, the government didn't do what it said it was going to do. Yeah, I mean, that sounded like they're making a contract claim that the 2008 decision was some sort of contract. It's not. It doesn't purport to be a contract, and they've not brought a contract action. They've brought a 706-1 action, and I think the magistrate and district court were correct that you can't bring a 706-1 action to challenge the implementation. Their remedy on the water rights, as the magistrate pointed out, is with the Oregon Water Resources Department. If they think the water master is not being strict enough with BLM, makes them sure that BLM is in position to release water, but they cannot bring a 706-1 claim, which is what this case is about. So I think the district court and magistrate correctly found that it was proper to dismiss. And just on the matter of the current reservoir, I would just point to excerpts of Record 247, which explains that the reservoir was added because the Water Resources Department of Oregon had indicated that it might require BLM to take some action there to satisfy a call. So, again, all of this was quite discretionary. And let's see if I have any other points. Oh, and the other point is it was said that the decision said that BLM would never pump these pumps, and that's not correct. What is being referred to is the environmental assessment, which considered an alternative, which would have relied entirely on pumping or siphoning, and found that that was not a feasible or practical alternative. But the decision itself, the 2008 decision, never says that we won't use pumps. It says we'll either retrofit or abandon. So unless there are other questions, thanks. Thank you. Anything else? Okay. Three points. First of all, in terms of this use of the word plan in terms of order, that's clearly just a distraction. Again, all sides of the court, ER 240 and 240 was the experts of record in which BLM, as Justice Burns correctly expressed, they allocated AUMs to each of the reservoirs. It was their decision to do so. In terms of the suggestion about if there's a problem, go to the Oregon Department of Water Resources. The Oregon Department of Water Resources, that is a second distraction, and it's a distraction because of this. The Oregon Department of Water Resources certainly does have jurisdiction over water, but it doesn't have any jurisdiction over the allocation and authorization of the AUMs, and that's what the BLM has jurisdiction over, and that's what they've canceled, and that's what the whites are complaining about. All right, Kelsey, you've exceeded your time. Thank you to both counsel. This is argued to be submitted for decision by the court.
judges: Gould, Rawlinson, Burns